AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☒ Original     ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| **FILED** | |
| CLERK, U.S. DISTRICT COURT | |
| 10/30/2023 | |
| CENTRAL DISTRICT OF CALIFORNIA | |
| BY: _____ TV _____ DEPUTY | |

United States of America

v.

FEREIDOUN KHALILIAN,

Defendant.

Case No.   2:23-mj-05596

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of August 17, 2023, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1512(b) | Witness Tampering |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Jesse Vazquez*
Complainant's signature

Jesse Vazquez, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     October 30, 2023

_____
*Steve Kim*
Judge's signature

City and state:   Los Angeles, California

Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

AUSA:   Jeremiah Levine

## AFFIDAVIT

I, Jesse Vazquez, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.    I am a Special Agent for the FBI, assigned to the Los Angeles Field Office, and have been so employed since August 2021.  I have received general investigative training from the FBI Academy.  I have also received specialized training from the FBI and other sources in the investigation of violent crimes.  As a result of my training and experience, I am familiar with the federal laws relating to violent incident crimes, as well as common international violent criminal offenses and worked Indian Country investigations involving violent crimes against women and children.

## II. PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of a criminal complaint against Fereidoun Khalilian ("Khalilian" or "defendant"), aka "Fred," for a violation of 18 U.S.C. § 1512 (Witness Tampering)

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated

otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  SUMMARY OF PROBABLE CAUSE

2.   On March 28, 2023, Magistrate Judge Patricia Donahue signed a complaint charging defendant with murder for hire in violation of 18 U.S.C. § 1958(a).  That complaint is attached hereto as Exhibit A.

3.   Defendant was ordered detained pending trial.

4.   Michael Sherwood, the bodyguard described in Exhibit A whom defendant hired to commit murder, was expected to testify against defendant at trial.

5.   On or about August 17, 2023, defendant, who was incarcerated at Metropolitan Detention Center in Los Angeles ("MDC-LA"), called his nephew and directed him, in substance and in part, to contact another of defendant's former bodyguards, Tyson James, through WhatsApp to direct James to attempt to change Sherwood's trial testimony.

6.   James then had several recorded phone calls with Sherwood, and an undercover FBI agent purporting to act on Sherwood's behalf, in which James offered money to Sherwood to change his testimony about defendant's murder for hire.  James also said that he was acting at defendant's direction in attempting to change Sherwood's testimony.

### IV. STATEMENT OF PROBABLE CAUSE

**A.   Background**

7.   On June 21, 2023, defendant was arrested on a complaint, which alleged a violation of 18 U.S.C. § 1958

(Murder-for-Hire).  Khalilian's arrest and subsequent indictment resulted from Khalilian using the telephone and internet to offer money to his former bodyguard, Sherwood, to murder Juan Esco.  Esco, Khalilian's former employee, was producing an unflattering documentary about Khalilian and interviewing Khalilian's closest friends and associates about Khalilan.  Esco was also prank-calling Khalilian.

8.    Khalilian's trial on murder-for-hire commenced on October 24, 2023, before this Court.  On October 30, 2023, this Court granted a motion under Federal Rule of Criminal Procedure 29 on the basis that the indictment was brought in the wrong venue.  At the conclusion of the Rule 29 hearing, this Court denied defendant's motion for forthwith release, found defendant to be a clear danger and flight risk, and ordered defendant detained pending resolution of the venue issue.

**B.    Witness Tampering**

9.    Based on my discussions with Special Agent Ramel Moore as well as from my review of case reports, recordings, and other investigative materials, I am aware of the following:

a.    On or about August 17, 2023, defendant Khalilian, who is detained at MDC-LA, used the telephone access pin of another inmate and had a telephone call that was in English and Farsi.  The call was recorded as part of MDC-LA's regular recording procedures.  I know the voice on this call to be Khalilian's because he referred to himself in the third person, I have heard Khalilian's voice on numerous occasions, and I am familiar with his voice.  On that call, Khalilian spoke with his

nephew and directed him, in substance and in part, to contact James through WhatsApp.

　　　　b.　On the same day, August 17, 2023, Sherwood received a call from a person he recognized to be James. Sherwood knew James because James had also worked as Khalilian's bodyguard.  On the August 17 call, which Sherwood did not record, James asked to meet with Sherwood but did not say why.

　　　　c.　On or about August 18, 2023, defendant placed another recorded phone call from MDC-LA, again using the telephone pin belonging to another inmate.  On that call, which was also in English and Farsi, and for which I have reviewed a translation, Khalilian spoke directly with James and instructed James to contact Sherwood so Sherwood could "tell the truth."

　　　　d.　On or about August 18, 2023, James texted Sherwood, "Hey Michael, it's Tyson.  I'll text you from my other number call me."  Sherwood did not return James's text.  Then, approximately 6 minutes later, James texted Sherwood the following message: "Hi Michael is Tyson.  Please call me when you get a second I need to tell you something else some one reach out to me.  And we can meet up if you want also I'm in Beverly Hills what are you."

　　　　e.　Sherwood and James then had an unrecorded telephone call.  According to Sherwood, during that call, James offered Sherwood money to withdraw his prior statement to law enforcement that Khalilian hired Sherwood to murder Esco.

f.   Sherwood promptly relayed the above information to the FBI, and the FBI asked Sherwood to record any future telephone calls he had with James.

g.   Over the coming days and weeks, James called Sherwood numerous times, with Sherwood often recording the calls at the FBI's request.  Sometimes, James and Sherwood were the only ones speaking on the call.  At other times, James was on the phone with people James identified as Khalilian's nephew and/or Khalilian's brother.  In at least one of the calls, James confirmed that the request for Sherwood to change his testimony came "from Fred," which is Khalilian's nickname.  In another phone call, James told Sherwood that "Fred" was the person who wanted to pay Sherwood $400,000 to change his testimony.

h.   During the calls with James, Khalilian's nephew and Khalilian's brother, Sherwood was asked to "tell the truth" in exchange for hundreds of thousands of dollars and the promise that he and his family would be "taken care of" for the rest of their lives.  The parties also discussed having an in-person meeting to advance the bargain they proposed.

i.   To maximize safety and minimize Sherwood's exposure to potential danger, FBI requested that Sherwood not meet with James and others in person.  Instead, the FBI requested that Sherwood introduce James and the others to a person Sherwood would claim was his friend, but who was actually and undercover law enforcement officer (the "UC") working to investigate the witness tampering.  The UC then had a recorded telephone call with James and Sherwood.  James said that "Fred"

wanted to offer Sherwood $400,000 "so that Michael can say that you know whatever he did never happened."  He also said that defendant "doesn't want to do it in front of everyone else because he can get in trouble too."

        j.   In September 2023, the UC contacted defendant's brother numerous times to arrange for the meeting that they had previously requested, but no meeting took place.

        k.   On or about October 9, 2023, James called Sherwood.  According to Sherwood, on that call, which was not recorded, James asked Sherwood to borrow money, which Sherwood declined to lend.  James then spontaneously sent to Sherwood a voice memo recording of Khalilian.  In that voice memo, Khalilian expressed his gratitude for helping him out with his case and reassured James that he would be handsomely rewarded for his help in getting him out of prison.

        l.   On or about October 19, 2023, FBI agents interviewed James.  James conceded that he offered $400,000 to Sherwood, but said he was just joking about the amount, and no one else had told him to offer that specific amount.  He said that defendant told him (James) to tell Sherwood to tell the truth.  He also said that defendant often said things that he did not mean.  He claimed that no one was trying to tamper with Sherwood, and that certain members of defendant's family were simply trying to get Sherwood to be truthful.

            i.   On earlier calls that James did not know were recorded, he had offered money to Sherwood and/or the UC to change Sherwood's testimony.  I believe that "tell the truth"

was defendant's coded language for corruptly seeking to have Sherwood change his story to be false.  Defendant was using another inmate's jail calling account to hide his witness tampering.

_____
JESSE VAZQUEZ, Special Agent
FBI

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 30th day of
October, 2023.

*Steve Kim*
_____
HON. STEVE KIM
UNITED STATES MAGISTRATE JUDGE

# Exhibit A

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Central District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| FEREIDOUN KHALILIAN | ) | Case No. |
| | ) | 2:23-mj-01486-DUTY |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

**LODGED**
CLERK, U.S. DISTRICT COURT

3/28/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JB _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT

3/28/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ IV _____ DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____March 9, 2023_____ in the county of _____Los Angeles_____ in the _____Central_____ District of _____California_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1958 | Murder for hire |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____/s/ Michael Fukuda_____
*Complainant's signature*

_____FBI Special Agent Mike Fukuda_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: ___March 28, 2023___

*Patricia Donahue*
*Judge's signature*

City and state: ___Los Angeles, CA___

Patricia Donahue, United States Magistrate Judge
*Printed name and title*

*AUSA:* Jeremiah Levine

### <u>AFFIDAVIT</u>

I, Michael Fukuda, being duly sworn, declare and state as
follows:

### I. <u>INTRODUCTION</u>

1.    I am a Special Agent with the Federal Bureau of
Investigation ("FBI") and have been so employed since 2008.  In
September 2008, I completed 21 weeks of training at the FBI
Academy in Quantico, Virginia, where I received formal training
in criminal investigative tactics, techniques and evidence
collection.  I have received training in, and have conducted,
investigations of kidnappings, murder-for-hire, extortion, bank
robberies, Hobbs Act violations, and other violent crimes.  From
September 2019 to the present, I have been assigned to the
Violent Crimes Squad and worked as a Hobbs Act Robbery and Bank
Robbery Investigator in the Los Angeles Division of the FBI.

2.    Since becoming an FBI Special Agent, I have received
formal training at the FBI Training Academy in Quantico,
Virginia.  This training included segments on conducting
criminal investigations, narcotics identification, organized
crime, and other law enforcement topics.  During the time I have
been employed by the FBI, I have participated in investigations
relating to kidnappings, murder-for-hire, extortion, bank
robberies, Hobbs Act violations, and other violent crimes.  I
have participated in many aspects of criminal investigations,
such as, but not limited to, reviewing evidence, the issuance of
subpoenas, the analysis of pen and trap and trace records,
consensually monitored telephone calls, conducting physical and

electronic surveillance, working with informants, and the execution of search and arrest warrants.  In connection with the murder-for-hire investigations in which I have participated, I have used a variety of investigative techniques, including witness interviews, speaking with law enforcement agents and officers, reviewing surveillance images and cellular telephone data, including cellular tower logs, as well as collecting and processing physical evidence.  As a result of this experience and my conversations with other law enforcement personnel, which includes FBI SAs experienced with murder-for-hire investigations, I am familiar with the methods used in the commission of murder-for-hire schemes as well as effective investigative methods to solve them.

## II. PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of a criminal complaint against FEREIDOUN KHALILIAN ("KHALILIAN"), aka "Fred," for a violation 18 U.S.C. § 1958 (Murder-For-Hire).

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.    On March 21, 2023, the FBI Los Angeles Field Office was contacted by Victim One who told investigating agents he was the target of a murder-for-hire scheme.

6.    Victim One is a documentary producer living in Los Angeles and is currently producing a documentary on the life of KHALILIAN.  Associates had informed KHALILIAN that the documentary was portraying KHALILIAN in a very negative light. KHALILIAN contacted one of his former bodyguards, M.S.[1], and offered to pay him $20,000 to kill Victim One.

7.    M.S. contacted Victim One and advised him of KHALILIAN's murder for hire scheme.  M.S. and Victim One staged a murder scene in Victim One's Los Angeles apartment, and photos of this scene were sent to KHALILIAN.  After M.S. sent KHALILIAN photos of the staged murder scene, KHALILIAN started to make payments to M.S. in installments varying from $2000 to $3500 via CashApp and a $4000 payment via Zelle.  To date, KHALILIAN has paid M.S. a total of $12,500, with additional payments expected in the next several days.

---

[1] M.S. is cooperating with law enforcement in this investigation. His criminal history includes an arrest on or about October 13, 2020, for soliciting/engaging in prostitution in violation of Clark County, Nevada, Code Section 12.08020.  At this point, I have not yet been able to confirm whether that arrest led to a conviction. To my knowledge, M.S. has not previously cooperated with law enforcement. He is not being paid for his cooperation or receiving other consideration for it.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    Relationship Between KHALILIAN and Victim One**

8.    Based on my conversations with other law enforcement agents, and my familiarity with this investigation, as well as my March 21, 2023, interview of Victim One, I am aware of the following:

a.    Victim One and KHALILIAN first met in 2009 in Miami, Florida, at a computer repair store where Victim One worked.  Victim One repaired a computer that KHALILIAN had brought in and KHALILIAN was so impressed by Victim One's work that he offered Victim One a position at his telemarketing company, MY CAR SOLUTIONS.  KHALILIAN wore expensive jewelry and claimed to be a billionaire.  He drove a Range Rover and claimed to also have a Lamborghini and Bugatti at his mansion.  The job KHALILIAN offered was an Information Technology (IT) specialist position that paid three times more than Victim One's job at the computer repair store.  Victim One took the job, and learned over time that MY CAR SOLUTIONS was a robocall service offering extended warranties for vehicles.  Victim One's job as an IT specialist was slow-paced, and he was able to listen in to some of the calls and conversations the operators were having.  Victim One suspected that MY CAR SOLUTIONS was running a scam that targeted the elderly and sought to defraud them with non-existent extended warranties.  Several months later, the FCC fined MY CAR SOLUTIONS four million dollars.  The facility was raided by federal authorities and the business was shut down.

b.    KHALILIAN was wealthy and lived an extravagant lifestyle that included luxury vehicles, expensive jewelry, and a security detail of at least four bodyguards that accompanied him whenever he was out.  KHALILIAN frequented nightclubs where he would spend $50,000 in one night.  KHALILIAN attributed his wealth to being a royal prince from the Middle East.

c.    KHALILIAN used social media to project an image of wealth, sharing pictures such as those below:

 

d.    After MY CAR SOLUTIONS was shut down, KHALILIAN wanted Victim One to continue working with him.  Victim One declined because he believed KHALILIAN was not who he claimed to be, but instead was a con man that accumulated wealth through deception.  Victim One doubted KHALILIAN was a royal prince, as he claimed to be from varying Middle Eastern countries depending on who he was trying to strike business deals with.

e.    In 2013, Victim One moved to Los Angeles, California to work in the film industry.  In 2019, Victim One

and KHALILIAN ran into each other in Los Angeles, California by happenstance. KHALILIAN introduced himself to Victim One's friends as being a prince from Dubai, calling himself "Prince Fred." Victim One researched KHALILIAN on the internet and learned KHALILIAN was linked to numerous fraud cases. Intrigued by KHALILIAN's life as a con man, Victim One decided to produce a documentary about KHALILIAN's life of fraud and deception. Victim One convinced KHALILIAN to be interviewed for the documentary by minimizing the fact that the documentary was an exposé and instead emphasizing the great publicity this would bring to KHALILIAN. After Victim One interviewed KHALILIAN over 5 days, Victim One conducted interviews with KHALILIAN's bodyguards, investors, and victims of KHALILIAN'S fraud. Some of the bodyguards explained that KHALILIAN would have them wear Secret Service pins and fake earpieces that were not connected to radios and tell people that KHALILIAN was a diplomat. Victim One traveled to Oklahoma to interview members of a Native American tribe on a reservation in Oklahoma who had purchased online gambling software from KHALILIAN. The tribe bought KHALILIAN's software for approximately 9 million dollars, but the software did not work, and KHALILIAN refused to return the money.

   **B.    Relationship between KHALILIAN and M.S.**

   9.    Based on my conversations with other law enforcement agents, and my familiarity with this investigation, as well as my March 21, 2023, interview of M.S., I am aware of the following:

a.   In March of 2021, M.S. was the head of security for a prominent rapper, and met KHALILIAN during a dinner with the rapper.  In May of 2021, the rapper went to prison to serve a three-year sentence for human trafficking.  KHALILIAN reached out to M.S. to see if he wanted to work as part of KHALILIAN's security detail.  M.S. agreed, and initially enjoyed working for him, but the hours were long.  In February 2022, M.S. saw a different side of KHALILIAN.  KHALILIAN had severe mood swings, and was especially negative about Victim One.  KHALILIAN described Victim One as a former employee who was trying to ruin his life with this documentary about KHALILIAN.  He told M.S. that someone was hacking his Instagram and bank accounts, harassing him and reaching out to KHALILIAN's friends and family.  KHALILIAN believed this person was Victim One.

b.   M.S. offered to reach out to Victim One and went to Los Angeles to speak with him.  During the meeting, M.S. felt that Victim One was not a bad guy, even though he did not understand why the documentary on KHALILIAN needed to be released.  M.S. met with Victim One a second time and did a recording for Victim One's documentary.

c.   Eventually M.S. grew tired of dealing with the emotional rollercoaster of working for KHALILIAN and resigned in May 2022.

**C.   KHALILIAN Solicits M.S. to Murder Victim One**

10.  Based on my training and experience, my participating in the investigation, and my review of WhatsApp messages and recorded telephone calls, I am aware of the following:

7

a.   On or about March 1, 2023, Victim One reached out to M.S. asking for KHALILIAN's girlfriend's phone number. M.S. reached out to KHALILIAN to let him know about this request and they renewed their conversation about Victim One harassing KHALILIAN.

b.   Victim One learned through social media that KHALILIAN and his girlfriend were vacationing in Europe in March 2023 to celebrate the girlfriend's birthday.  During a two-week period in early March 2023, Victim One called KHALILIAN approximately 20 times using various spoofed phone numbers. Victim One recorded some of these calls, and did not say anything on the calls except one or two words to greet KHALILIAN, such as "Fred," "Fareed," and/or "Habibi."  Victim One made these calls, which he surmised KHALILIAN knew were made by Victim One, because Victim One wanted to record any inflammatory statements that KHALILIAN would say.  On March 8, 2023, at approximately 6:19 P.M., Victim One used a spoofed phone number to call KHALILIAN.  The call included these words by KHALILIAN:

KHALILIAN:    I'm going to fuck you up bitch. [Victim One], I'm going to have your fucking head. I'm going to fuck you up so hard.  [Victim One], you're a fucking piece of shit, you motherfucking, cocksucking, motherfucker.  Listen to me you motherfucker.  When I'm done with you, I'm going to cut each one of your fucking fingers off.  I'm coming for you, motherfucker.  I was leaving you alone for a

8

couple of years, you hear me you cocksucker? Say
hello. Talk bitch. [Victim One], listen to me. I'm
going to get you. I'm going to cut your fucking dick
off. I'm going to stick it in your mouth while I fuck
you in the ass, and then while I'm cutting your
fingers off, I'm going to cum all over your face, you
fucking, cocksucking, motherfucker.

c.    On March 8, 2023, at approximately 9:06 P.M.,
KHALILIAN messaged M.S. on WhatsApp, "Michael Call me please."

d.    On March 9, 2023, KHALILIAN sent a video message
to M.S. where he talked about Victim One, "Look at this fucking
psycho, look at what he is doing. He is blowing up my fucking
phone bro, calling everybody's name, numbers, just blowing me up
all day. And showing you my email box, saying I want to ship my
car. Just going crazy."

e.    On March 9, 2023, M.S. responded, "They are just
waiting on him to leave. I may use [a celebrity chef] to bait
him out."

f.    On March 9, 2023, KHALILIAN messaged M.S. on
WhatsApp and sent a video where he speaks to the camera saying,
"Can you tell them to send us some type of proof that they are
there please." M.S. responded, "Yes."

g.    On March 9, 2023, M.S. messaged, "Other stuff,
they said they will send you proof of everything if you catch my
drift shortly. Also, they will grab anything you need them
too."

h.   On March 9, 2023, KHALILIAN messaged, "Now he is fucking with [KHALILIAN's girlfriend] and her account."  I believe this is referencing KHALILIAN's girlfriend and someone hacking her social media account.

i.   On March 9, 2023, M.S. messaged, "Imma have [a celebrity chef] reach out to him.  To see if he can get [Victim One] outside.  [The celebrity chef] reached out and is waiting on a response."

j.   On March 9, 2023, KHALILIAN messaged, "Brother he is hurting all my shareholders tribes everything."

k.   On March 9, 2023, M.S. messaged, "[The celebrity chef] is setting it up.  Imma call [Victim One] and tell him to see if we know anyone in the building."

l.   On March 11, 2023, M.S. messaged a screenshot of the website for the apartment complex where Victim One lives.

m.   On March 16, 2023, KHALILIAN messaged, "I need this done ✓"

n.   On March 16, 2023, M.S. messaged, "Already booked.  Not leavin ya hanging. I got it I'll be there personally . . .I'm want to pay them 1,000 each, these are Mexicans.  There is three of them." M.S. also provided a hotel confirmation for Courtyard Los Angeles for March 17-19, 2023.

o.   On March 17, 2023, at approximately 10:36 A.M., M.S. called Victim One to warn him that KHALILIAN was paying M.S. $20,000 to have Victim One killed.  Victim One and M.S. discussed staging a fake death scene to lead KHALILIAN into believing Victim One had been killed.

10

p.   On March 17, 2023, at approximately 12:01 P.M.,
M.S. messaged, "You'll have proof of everything by 6pm my time
tomorrow night.  Enjoy your time.  I got you.  Lmk about the
deposit thing, when you can."

q.   On March 17, 2023, at approximately 3:39 PM M.S.
sent a staged proof of death photo of Victim One and told
KHALIALIAN that, "I have 67 photos and a video."  The item shown
below is among the staged photos of Victim One's murder:



r.   M.S. sent a photo of a Florida DMV License
belonging to KHALIALIAN saying, "This dude had an old DL of
yours."

i.   On March 17, 2023, at approximately 3:39 PM, M.S. received $3000 on the application CashApp from $PrinceFredKhalifa with the note, "For my guys."

ii.   On March 17, 2023, at approximately 9:31 PM, M.S. received $3500 on the application CashApp from $PrinceFredKhalifa.

iii. I reviewed documents provided by CashApp which document that the $PrinceFredKhalifa account belongs to KHALILIAN.  The documents state KHALILIAN's correct birthdate and the last four of his Social Security Number.  I believe the account is owned by KHALILIAN.

s.   On March 18, 2023, M.S. sent additional photos of documents reportedly found in Victim One's home related to KHALILIAN.

**D.   KHALILIAN and M.S. discuss additional payments and Victim One's murder.**

11.   On March 21, 2023, Victim One reported KHALILIAN's murder-for-hire scheme to the FBI Los Angeles Office.  Beginning March 22, 2023, M.S. conducted a series of phone calls to KHALILIAN under the direction of FBI agents.  These phone calls were monitored and recorded by FBI agents who were with M.S. during the calls.

12.   On March 22, 2023, at approximately 3:58 P.M., M.S. made a consensually monitored and recorded phone call to KHALILIAN at 424-302-6161.  During this phone call, the following conversation took place:

12

M.S.:      Oh, just to let you know, my Zelle situation is taken care of.

KHALILIAN:      Finally?

M.S.:      Yeah, it went through.

KHALILIAN:      I'm going to do a test right now.

M.S.:      It's a different email.  I'll text you the email and you can just send it to that email.

KHALILIAN:      I'll text it to that email.  Text it to me right now.

M.S.:      Alright.

13.  Following the phone call, M.S. texted KHALILIAN an email address linked to a Zelle account ("the Zelle account") controlled by the FBI.

14.  On March 23, 2023, at approximately 10:27 A.M., M.S. made a consensually monitored and recorded phone call to KHALILIAN at 424-302-6161.  During this phone call, the following conversation took place:

KHALILIAN:      My brother.

M.S.:      Hey Fred, what's going on?

KHALILIAN:      How are you, sir.  I'm in the shower. Everything okay?

M.S.:      Yeah, I just need to talk to you real quick.  Can you call me back right when you get out?

KHALILIAN:      No problem, we can talk right now. What's going on?

M.S.:          Hey, uh, those guys, the ones we sent
that first payment to for [Victim One]'s, you know,
Juan's thing?  The ones that took out [Victim One]?

KHALILIAN :    Yeah, the first one

M.S.:          Basically, so they got rid of his body,
you know the ones that killed him, they basically are
asking for another thousand, so I'm wondering if you
would, that account for right now, the one that I sent
you, can you use…

KHALILIAN:     No problem.

M.S.:          Can you send me uh…

KHALILIAN:     Do it through CashApp or through Zelle?

M.S.:          If you could Zelle the account I sent
yesterday, I'm just going to take it out of the
business account so it doesn't look weird, and I'm
going to give it to them so we can just be done with
them.

KHALILIAN:     How much do you want me to send?

M.S.:          If you could just send them a thousand
each.  There's only three of them.

KHALILIAN:     Okay, I'll send it right now. No
problem.

M.S.:     Okay, thank you.

    15.  On March 23, 2023, at approximately 10:30 A.M., the
Zelle account received a deposit of $4000.

    16.  On March 23, 2023, at approximately 11:18 A.M., M.S.
made a consensually monitored and recorded phone call to

KHALILIAN at 424-302-6161.  During this phone call, the
following conversation took place:

> KHALILIAN:      My brother, everything okay?
>
> M.S.:           Yeah, everything's good, I just wanted to
> let you know I got it and I've already sent it off to them.
> I just gave them $1250 each.
>
> KHALILIAN:      Thank you, thank you, sir.  His body, nobody
> is going to be able to find him, huh?
>
> M.S.:           No, no one's going to be able to find him.
>
> KHALILIAN:      Alright, cool.
>
> M.S.:           They actually asked if you wanted a
> souvenir.
>
> KHALILIAN:      Yes.  No, no I don't.
>
> M.S.:           [Laughing] I told them I'd ask but that's
> about it.
>
> KHALILIAN:      Yeah, they like to cut heads and fingers and
> shit.

## V.  <u>REQUEST FOR SEALED FILING</u>

17.  I respectfully request that this Court issue an order
sealing, until further order of the Court, all papers submitted
in support of this application, including the application,
complaint affidavit, and arrest warrant.  I believe that sealing
is necessary because, as far as I am aware, KHALILIAN remains
unaware of steps taken to charge and arrest him.  Disclosure of
the these documents at this time would seriously jeopardize law
enforcement efforts to locate and arrest KHALILIAN, as such

15

disclosure may provide an opportunity to change patterns of behavior or allow flight from prosecution.  Further, based upon my training and experience, I have learned that sophisticated criminals sometimes search for criminal affidavits and arrest warrants via the Internet.  Premature disclosure of the contents of these documents may have a significant and negative impact on this continuing investigation and may severely jeopardize its effectiveness.

## VI. <u>CONCLUSION</u>

18.  For all the reasons described above, there is probable cause to believe that KHALILIAN has solicited the murder of Victim One in violation of 18 U.S.C. § 1958 (Murder-For-Hire).

_____
Michael Fukuda, Special Agent
FBI

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 28th day of
March, 2023.

*Patricia Donahue*
_____
HON. PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE

16